## PIEDMONT MANUFACTURING COMPANY v. COLUMBIA AND GREENVILLE RAILROAD COMPANY.

1. A common carrier is responsible to the full extent of his liability as such, notwithstanding any contract he may make with reference thereto; but one not a common carrier may make any lawful contract which the parties choose.

X

2. The true test of a common carrier is: Is it optional with him whether he will carry or not, or is it his legal duty to carry for all alike? If the latter, he is a common carrier; if the former, he is not.

3. A company chartered and organized for railroad transportation is a common carrier over its own line, but it is not so beyond its *termini* and over connecting lines unless it has become so by usage, character of business or contract.

4. The payment of freight and passenger fare through to points beyond the *termini* of a railroad does not make it a common carrier over other roads to the point of destination.

5. The duty or obligation to convey the goods beyond its own line of road, and to deliver them at a point beyond its own line, is not imposed by law, but depends upon the contract between the shipper and the company.

6. The bill of lading is the contract between the shipper and the company by which the company agrees to transport and deliver beyond its own line, and the terms and conditions of the contract regulate and determine the duties and obligations of the contracting parties.

7. The signature of the shipper is not necessary to establish his assent to the terms of a bill of lading.

8. It is the duty of the judge to construe a written contract, but where there is dispute as to which of two agreements the parties acted under, that is an issue of fact which it is the province of the jury to determine.

9. This case distinguished from *Kyle* v. *Laurens Railroad Company*, 10 *Rich.* 382.

10. Letters from the president of a railroad company, written after the destruction of goods by fire, admitting the liability of his company therefor, are not evidence against the corporation in action brought to recover for such loss.

MR. JUSTICE McGOWAN *dissenting.*

Before ALDRICH, J., Greenville, April, 1882.

In his dissenting opinion Mr. Justice McGowan makes a full statement of the case, as follows :

In the case first named in the title, the plaintiff corporation brought an action against the defendant corporation for $240, the value of three bales of domestics, shipped by the former at their factory in Greenville, upon the railroad of the defendant, to be carried by its own and connecting lines to Baltimore, in the State of Maryland, and there safely delivered to Woodward, Baldwin & Norris, for freight, at the rate of fifty-six cents per one hundred pounds. The allegation was that the defendant corporation did not safely carry and deliver the goods pursuant to agreement, but, on the contrary, the defendant and connecting lines so negli-

gently acted in regard to the same, in their calling as carriers, that said goods were lost and never delivered. The defendant corporation made several defenses : First, they denied the contract as alleged. Second, that there was any negligence on their part, as they delivered the goods to the Charlotte, Columbia and Augusta Railroad at Columbia, and that their liability ended with such delivery: And third, that they received the goods under a special contract, exempting them and all connecting lines from liability from loss by fire, and if there was any liability it should fall only on that line in whose actual custody the property was at the time of the loss ; and that the said three bales of domestics were destroyed by fire while in transit, viz. : at West Point, Virginia, on board the steamer Shirley, belonging to the Baltimore, Richmond and Chesapeake Steamboat Company.

The second case named was for $1,600, the value of twenty bales of domestics, shipped at the same time and under the same circumstances to Woodward, Baldwin & Co., New York. These bales were destroyed at the same time and place and by the same fire, there being no difference in the facts except that the three bales were actually on board the steamer, and the other twenty were on the wharf when destroyed. The cases on the Circuit were considered as similar, and the result in one determined the other. It appeared that Mr. Hammet, president of the Piedmont Manufacturing Company, wishing to ship his fabrics North, met in Columbia the general freight agent of the Columbia and Greenville Railroad, and made with him an arrangement for " through rates " to Baltimore, for which the Piedmont Company was to pay fifty-six cents per one hundred pounds to Baltimore, and sixty cents per one hundred pounds to New York. At that time nothing whatever was said about limiting the liability of the defendant.

Some time afterwards, November 22d, 1880, under this general arrangement, those having charge at Piedmont (Mr. Hammet was absent from the State) sent three bales of domestics to the Piedmont station on the railroad, and delivered them to one W. B. Vaughn, agent of the railroad company at that point, who gave a printed receipt for the same. This paper was headed " Greenville and Columbia Railroad, through bill of lading."

It acknowledged the receipt of the three bales, " to be transported by the Greenville and Columbia Railroad to Columbia, Greenville or Seneca City, as the case may be, and thence by connecting lines—same to be delivered in like order and condition—to Woodward, Baldwin & Norris, Baltimore, Maryland."

This paper was not signed by the shipper, but contained in small type " conditions," declaring the railroad companies exempt from liability in many cases stated at length, and among other things as follows : " That the said Greenville and Columbia Railroad and connecting railroads and steamship lines shall not be liable for loss or damage on any article of property whatever, by fire or other casualty while in transit or while in depot, or in other places of shipment or transhipment, or at depots and landings at points of shipment and delivery. * * * And it is further stipulated and agreed, that in case of any loss, detriment or damages done or to be sustained by any of the property herein receipted for during such transportation, whereby any legal liability or responsibility shall or may be incurred by the terms of this contract, that company alone shall be held answerable therefor in whose actual custody the same may be at the time of happening of such loss, detriment or damage ; and the carrier so liable shall have the full benefit of any insurance that may have been effected upon or on account of said goods, &c. In witness whereof the agent hath affirmed to one bill of lading, all this tenor and date, one of which being accomplished the others to stand void.          (Signed,)          W. B. VAUGHN,

For agent."

A similar receipt was given on the shipment of the twenty bales to New York.

It appeared that the property in its transportation had reached West Point, Virginia, where it was placed on board the steamer Shirley, to be forwarded to Baltimore, but, before the steamer left the wharf, it, with everything on board, was consumed by fire, on the night of November 28th, 1880. At the same time the twenty bales were burnt on the wharf. The fire originated about one o'clock at night, and consumed not only the steamer, but all the wharves and property thereon. The cause of the

fire was unknown, and no evidence was offered as to whose fault it was, or whether it occurred from negligence.   Some correspondence was had upon the subject of liability for the loss with Mr. R. L. McCaughrin, then president of the Columbia and Greenville Railroad Company, who thought the claim ought to be paid, but desired the plaintiff to sue, as " it was necessary to have a judgment determining the liability in order to fasten the loss upon the insurance companies and on the parties responsible to us," &c.   These letters, against the objection of the defendant, were received in evidence.

The charge of the judge was as follows :*

On the 22d November, 1880, Mr. Hammet, the president of the Piedmont Manufacturing Company, shipped twenty bales of drills, at Piedmont, to be delivered to Woodward & Co., New York, worth $1,600.   He says : " Our agreement for shipments, through rates, was made with the general agent in Columbia.   We were to pay sixty cents per hundred pounds to New York.   There was no contract as to limiting the liability of defendant.   No allusion was made as to such limitation.   We were not insured, and did not know of the fire.   I was in New England at the time, and did not learn of it until after my return to the State.   When I learned of the loss, I wrote Mr. McCaughrin, the president of the Columbia and Greenville Railroad Company, who, while acknowledging the justness of the claim, requested me, after several letters had passed, to bring this ' friendly suit' to fix the liability.   I gave no instructions on what line to ship the goods.   The Greenville and Columbia Railroad were shipping by three routes.   My contract was made with agent of defendant.   Signed no release.   West Point is on the Piedmont Air Line.   The bill of lading was signed by Vaughn.   The Charlotte, Columbia and Augusta Railroad receipted for the goods at Columbia.   They were burned at West Point, Virginia."

The receipt given by Vaughn, the agent, is the subject of this litigation.   It is dated 22d November, 1880, headed Greenville

---

* This charge is printed in both briefs, both cases being submitted to the jury together; the agreement being that the result in one case should determine the other.—REPORTER.

and Columbia Railroad, "through bill of lading." It purports to have received of the Piedmont Manufacturing Company certain packages, "to be transported by the Greenville and Columbia Railroad to Columbia, Greenville or Seneca City, as the case may be, and thence by connecting lines; same to be delivered in like order and condition to Woodward, Baldwin & Co., New York." Then follows a description of the goods in writing and printing in distinct type and letters; also, a "Release," in fine type, which is not signed by the shipper. Then follows the "Conditions," also in fine type; the whole paper, at the end of the conditions, is signed by "W. B. Vaughn, Freight Agent."

The question is : Who is liable to this plaintiff—the defendant or some of the connecting lines? Undoubtedly, Mr. McCaughrin, the president of the Greenville and Columbia Railroad, held his company liable. His correspondence shows that. With perfect frankness and fairness he admits the liability of his company in the first instance. But finding there was some difficulty about the insurance, under the advice of counsel he requested this suit to be brought to fix the liability. I do not clearly see, if he thought his company was liable, why this should be desired, but suppose, as a prudent man, he thought it better to act under the advice of counsel rather than to follow the dictates of his own judgment as to whom the responsibility first attached. Hence this suit.

Now the question presented to you is, What was the contract? Was it the contract made by the President of the Piedmont Company and the general agent of the Greenville and Columbia Railroad in Columbia, or this paper signed by Vaughn? When the goods reached Piedmont station was a new contract made, or did Vaughn sign that bill of lading, to carry out the contract made with the general agent? Mr. Hammet was not there; he did not sign the paper, and expressly says the goods were shipped under the contract made in Columbia, in which there was not a word said about limiting the liability. You will observe this bill of lading is a "through bill," in which the Greenville and Columbia Railroad agree to transport by connecting lines and deliver to Woodward, Baldwin & Co., New York, the goods lost. Is not that the very contract Mr. Hammet

made with the general agent in Columbia? What right had he to alter the terms of that contract, at Piedmont, and attach a release and conditions? None in the world that I can see. There is no proof on that subject, and I regard that bill of lading simply as a receipt to carry out the agreement previously entered into between Mr. Hammet and the general agent of the defendants.

It does seem unreasonable to hold, that when a shipper intrusts his goods to a common carrier, who stipulates that he will deliver them by connecting line in New York, that he is discharged from liability when he delivers them to the first connecting road on the line of connection. The shipper has made no contract; sent no freights to any other line on the route.

This "through" line, North and East, South and West, was not made for his convenience, but for the benefit of the common carriers composing the line. It is true, it is a convenience to the shipper; but if, when he makes a contract with the Greenville and Columbia Railroad, he is to place his goods to the Charlotte, Columbia and Augusta Railroad and all the other lines of connection, and can only hold that line liable on which the goods were lost, and with which he made no contract, it has to me very much the appearance of a snare.

Evidently Mr. Hammet thought that when he made his agreement with the general agent to have his goods transported on the connecting lines he represented, North and East, West and South, at a stipulated rate of freight which they were to divide, he had a binding contract with the initial road with whom he made the contract, and that the initial road of the connection could not shift its responsibility by any device of releases or conditions in consequence, signed by a local agent at a local station. Is it reasonable, nay, is it just to make the shipper look to any other company than the company with whom he has made the contract? Is it fair, after he has made a contract with the general agent of the combination, in which there was no stipulation whatever, to hold him bound by a printed form, filled with limitations and stipulations, signed by a local agent, to which the shipper has not given his assent by attaching his signature? In all probability, if he went to any other company

than the one with whom he made the contract, he would be told, " We made no contract with you; go to the company with whom you contracted."

This war between common carriers and shippers has been going on from time immemorial. Every device that the ingenuity of man can suggest has been adopted to avoid and shift their responsibility. Since the introduction of railroads, so great is their influence that some States have been induced to change the English rule and adopt what Mr. Lawton calls the American rule. That time has not yet arrived in South Carolina, and we still hold to the English rule, the rule of our ancestors, from whom we have borrowed our jurisprudence.

Admit that a corporation is only liable for the loss of goods shipped over its corporate territory. This is good law. But suppose several corporations, in contiguous States, contract to carry " through freights" over their respective roads and connecting lines, and for that purpose appoint a general agent, who receives pay for the freight at the initial point: I hold that the English rule prevails, and the corporation receiving the freight and giving the receipt at the initial point is responsible.

It is true, as was argued, the legislature has given its construction, that the initial road is responsible until it produces the receipt of the connecting road. But that does not apply to the shipper; it applies to the roads forming the combination. The corporation making the loss is liable to the other corporations forming the connecting line; but the shipper looks only to the corporation who received his goods, took his money, and contracted to deliver the freight in New York. If the loss is disputed, who is to sue? Why, the road who gave the bill of lading, and not the shipper. They must adjust their difficulties among themselves, and not put the confiding shipper to the trouble and expense of running from State to State to find out where the goods were lost, how they were destroyed; if it was negligence, or the act of God, or the public enemy; and, perhaps, when he does make the discovery, the corporation may be bankrupt, while the initial company, with whom he had made the contract, is perfectly solvent. I hold such a construction to be unjust and unwarrantable, either by law or reason. My view

of the legislative construction is, not that the initial road receiving the goods and giving the bill of lading to the shipper is not relieved from liability to the shipper, but as among the companies composing the corporation or through line, that company making the loss shall bear the whole liability, and not distribute it among them all.

If you determine that the contract was the agreement between Mr. Hammet, president of the Piedmont, and the general agent of the through line at Columbia, and that the bill of lading was a mere receipt in pursuance of that agreement, your verdict will be for the plaintiff for the sum of $1,600, with interest from the first day of December, 1880.

The judge subsequently instructed the jury to include the interest on the amount of damages found, if plaintiff has proved himself entitled to any, but not to find interest *eo nomine*.

The jury found a verdict for plaintiff in both cases. From the judgments entered upon these verdicts the defendant appealed upon the following exceptions:

I. Because his Honor refused to instruct the jury as prayed by the defendants.*

(*a.*) That the legal duty and obligation of the Columbia and Greenville Railroad Company as common carrier, was only to convey over its own line of road. The corporate franchise and legal duty are commensurate.

(*b.*) That the duty or obligation to convey the goods beyond its own line of road and to deliver them at a point beyond its own line is not imposed by law, but depends upon the contract between the shipper and the company.

(*c.*) That the bill of lading is the contract between the shipper and the company, by which the company agrees to transport and deliver beyond its own line, and the terms and conditions of the contract regulate and determine the duties and obligations of the contracting parties.

(*d.*) That by the terms of the contract the Columbia and Greenville Railroad Company was not to be liable for goods

---

* It nowhere else appears in the brief that the judge was requested so to charge, but no objections were urged upon this omission.

destroyed by fire in transit or at depots and landings or in depots or other places of transhipment. And if the goods in question were destroyed by fire while in transit beyond the line of defendant's road, or while in depot or other place of shipment or transhipment, or while at depots and landings at points of shipment and delivery beyond the line of the defendant's road, then the defendant is not liable and the verdict should be for the Columbia and Greenville Railroad Company.

(e.) That in and by the sixth clause of the contract between plaintiff and defendant, it is stipulated and agreed that in case of loss during transportation whereby legal liability may be incurred by the terms of the contract, that company alone shall be answerable for such loss in whose actual custody the property was at the time of the happening of the loss. And if the jury are satisfied that the goods in question were in the actual custody of some other carrier when burnt, then this defendant is not liable. And under the terms of the contract the action must be against the company in whose actual custody they were when destroyed."

II. Because his Honor submitted as the only question for the jury to decide, Who is liable, defendant or some other person?—whereas one of the main questions in the cause was, whether under the bill of lading any one was liable.

III. That the bill of lading was the only contract for the carriage of these goods that was proved, and that his Honor erred in submitting to the jury whether the contract for carriage of these goods was the agreement between Mr. Hammet and the general freight agent, or the bill of lading, signed by the agent of the company when the goods were delivered to the company.

IV. That the plaintiff having put in evidence the bill of lading signed by Vaughn, agent of defendants, no previous parol agreement could alter or affect the terms of the bill of lading or substitute any other agreement for the contract evidenced by the bill of lading.

V. Because his Honor erred in instructing the jury that the real contract was that made between Mr. Hammet and the general freight agent, and the agent at Piedmont had no right to alter the terms or annex conditions; and erred in instructing the

jury that the bill of lading was simply a receipt to carry out the agreement previously entered into with the general freight agent.

VI. That whether the contract was the contract of the Columbia and Greenville Railroad Company for the entire carriage or the contract of each successive line, the exceptions in the bill of lading of responsibility for loss by fire at depots &c., attached to the goods and accompanied them from Piedmont to their destination. That this is the English, as well as the American doctrine, and that his Honor erred in ruling to the contrary.

VII. That his Honor erred in holding that the signature of the shipper was necessary to establish his assent to the terms of the bill of lading.

VIII. That the act of the legislature of 1882, does require shipper to go from road to road, until he finds the party in default. And that his Honor erred in ruling to the contrary.

IX. That his Honor erred in admitting the letters of President McCaughrin. That the liability of defendants was a legal question to be determined by the courts, and the declarations or opinions of the president after the loss are not admissible to impose liability on defendants.

*Messrs. Conner & Cheves*, for appellant.

*Messrs. Wells & Orr, T. Q. Donaldson*, contra.

October 25th, 1883. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. In November, 1880, the plaintiff delivered to the defendant at Piedmont station, Greenville county, twenty bales of domestics, to be transported to Woodward, Baldwin & Co., at New York, and at the same time and place three bales for Woodward, Baldwin & Norris, at Baltimore. The bill of lading given by the defendant will be found in the brief. It contains a stipulation, that, in case of loss, "the company in whose actual custody the property was at the time of the loss should be answerable." Also an exemption for loss by fire. The twenty bales were destroyed by fire in transit on the wharf at West Point, Va., and the three bales at the same place on board the steamer Shirley, lying at the wharf. This

action was brought to recover damages for the loss of these goods.

The defendant relied upon the exemption in the bill of lading as to fire—that being one of the excepted perils in said bill—and also upon the stipulation as to the liability of the company actually in custody. Two actions were brought below, but as the facts and principles involved were substantially the same in both, it was agreed that the result of the trial in one should determine the other. The jury found for the plaintiff in both cases. The defendant has appealed.

It is admitted that common carriers in this State cannot limit their common law responsibility by any notice or declaration or special contract for or in respect of any goods to be carried by them. This was specially provided by act of legislature (*Gen. Stat.*, 1872, *p.* 336,) of force at the time of this loss. The first and prominent question, therefore, in the case is, Was the defendant a common carrier as to the goods in question when they were destroyed? If so, then the exemptions in the bill of lading (supposing that to contain the contract) would not avail. If, however, the defendant did not sustain the relation of common carrier as to these goods at the time of their destruction, then, upon equally as well-settled principles as the above, its liability would depend upon the terms of the contract by which the company undertook to ship the goods beyond the terminus of its own line. In other words, the law is, that a common carrier is responsible to the full extent of his common carrier liability, notwithstanding any contract he may make with reference thereto as to all goods, &c., to which he sustains the relation of common carrier; while, on the other hand, one who is not a common carrier may make any contract for transportation which the parties choose, not contrary to law. *R. R. Co.* v. *Pratt*, 22 *Wall.* 129 ; *R. R. Co.* v. *Manufacturing Co.*, 16 *Wall.* 324.

The true test of the character of a party, as to the fact whether he is a common carrier or not, is his legal duty and obligation with reference to transportation. Is it optional with him whether he will or will not carry? or must he carry for all? If it is his legal duty to carry for all alike, who comply with the terms as to freight, &c., then he is a common carrier, and is subject to all

those stringent rules which, for wise ends, have long since been adopted and uniformly enforced, both in England and in all the States, upon common carriers.  If, on the contrary, he may carry or not, as he deems best, he is but a private individual, and is invested, like all other private persons, with the right to make his own contracts, and when made to stand upon them.  While the law has imposed duties and heavy responsibilities upon common carriers, which they cannot avoid, limit or shake off, yet it has never attempted to hamper and surround those who are not common carriers with the stringent rules applicable to carriers, or to prevent them from exercising their own judgment as to the responsibilities which they are willing to assume in a special case.

Now the important question arises:  Was the defendant a common carrier with reference to the goods in question?  The defendant is a corporation created under an act of the legislature, and was formed and organized for railroad transportation between certain points in this State, and as to this railroad and between these points it is certainly a common carrier in the full sense of that term, subject to all the laws and principles, statutory and otherwise, which have been established in this State in reference to common carriers.  And if this loss had occurred between the *termini* of the road there would be no difficulty in the case.  In fact, in that event, we suppose the case would not have been here.

It is equally as certain that, so far as the charter of the company is concerned, under its provisions this corporation is not a common carrier beyond its own *termini,* there being no legal duty imposed to receive and transport goods beyond those points.  It would seem to follow then, from these principles, that if liability has attached to the company it must be either because the said company has become a common carrier beyond its *termini* and over the connecting lines by usage, its character of business, or by contract, express or implied; or it has become liable in this special case by a special contract covering the case.

There is no foundation for the first position; in fact, it has not been urged in the argument that this company has become generally a common carrier outside and beyond the limits of its charter and over its connecting lines, and that it is legally

bound to transport goods to any point beyond its line as may be designated by the shipper. It is true that the destination of the passengers embarking on this road, and of the goods shipped thereon, is frequently beyond its own *termini*, and at points reached only by connecting roads; but this fact cannot, nor does the payment and receipt of the fare and freight through to the destination, which is as much for the convenience of the traveler and shipper as for the roads, make the company first concerned *ex vi termini* a common carrier through the whole distance. Such a doctrine would make railroad enterprises a fearful business. It would destroy them utterly, and it finds no place in the books or in reason.

Railroad corporations, however, while being common carriers between their *termini*, and bound inflexibly by the law on this subject; with no power to alter, amend or limit it as to transportation on their immediate line, may yet contract to deliver consignments at any point beyond such *terminus* as may be agreed upon, and this contract may be either absolute or conditional, and when made it is subject to the adjudication of the courts, as all other contracts are. The defendant being a carrier only to the extent of its line under its charter, was not bound to receive and ship the goods of the plaintiff beyond its *termini*. This was optional, as we have seen, and its liability, therefore, in such cases must depend entirely upon the contract made between the parties. Was it absolute, or was it conditional? and if conditional, did the conditions happen which were to exempt the road?

The complaint charges that in consideration of a certain sum the defendant "agreed safely to carry from Piedmont station to the city of New York, over their connecting lines, and there deliver to Woodward, Baldwin & Co., in good order," the goods in question. This is an allegation of an absolute and unconditional agreement, and, had it been sustained by the evidence, there would have been no escape for the defendants; the case of *Kyle* v. *Laurens R. R. Co.*, 10 *Rich.* 382, would have been directly in point. The answer of the defendant puts in a positive denial of the charge in the complaint, and sets up a special and conditional agreement as to the shipment of these special

goods.   Upon the complaint and answer, the first question before the court below, as it appears to us, was one of fact, and for the jury, to wit: Was the contract absolute and conditional, as alleged in the complaint, or was it, as stated in the answer, subject to conditions and contingencies?

The testimony on this subject on the one side was the evidence of Mr. Hammet, the president of the plaintiff company, where he said generally: "All our arrangements for shipment and through rates were made with the general freight agent of the Columbia and Greenville Railroad Company at Columbia.   We were to pay sixty cents per one hundred pounds freight to New York.   No contract as to limiting liability of defendant was made or even alluded to.   I was in New England when goods burnt." The evidence of the agreement set up in the answer was the bill of lading given when the goods were received at Piedmont station by W. D. Vaughn, agent of the Columbia and Greenville Company, and signed by him as such agent.   This bill of lading, it seems, was given to the plaintiff, and by it forwarded to the consignee in New York.

The judge, in his charge, instructed the jury that the agreement between the parties was the one detailed in the testimony of Mr. Hammet;   that this agreement was unconditional and had no limited liability attached;   that the agent, Vaughn, had no right to alter the terms of this contract and attach conditions, and that, in his judgment, the bill of lading was simply a receipt to carry out the agreement previously entered into between Mr. Hammet and the general agent of the defendants.

We think this charge was erroneous.   It is true that it is the province of the judge to construe agreements and extract their meaning, but it is first the province of the jury to determine what agreement has been made.   Here, it seems to us, the judge went beyond construction and charged upon facts, the finding of which is alone the province of the jury.   The charge in this respect is subject to the fifth exception of defendant.   It is not for this court to adjudge or indicate what the precise agreement between the parties was.   This, as we have said, is a question of fact for the jury, and the jury should have been left untrammeled in the duty of determining the fact; and as, in our opinion, they

were not so left, the cases must go back on this ground if no other.

But, even supposing that the evidence of Mr. Hammet is the controlling testimony in the case, and that he detailed truthfully what occurred between himself and the general agent (of which there is no doubt), yet we think it was error of law in the Circuit judge to hold that that agreement amounted to an unconditional contract on the part of the defendants to transport and deliver at all times and to all points whatever goods the plaintiffs might ship over the road of the defendant to some destination by connecting lines beyond its *termini*, and that the agent of the defendant, who gave the bill of lading, could not alter the terms of this previous contract.

We do not see anything of a positive agreement in the interview between Mr. Hammet and the general agent of Columbia, except as to the rates upon which his goods were to be shipped. He says: "All our arrangements for shipment and through rates were made with the general freight agent of Columbia and Greenville Railroad Company at Columbia." But what these arrangements were is not specified, except as to the rates. Under such circumstances we do not see why the agent of the company and the plaintiff might not specify the terms and conditions of the shipment, when he came to receive a special consignment. It would certainly not be illegal for the shipper and the agent at that time to include in the bill of lading such stipulations as might be agreed upon. Whether both parties consented and agreed upon the stipulations, or understood them alike, might be a question dependent upon the facts, but that they would have the right to insert such as they deemed proper, there could be no question. The error of the charge was, that the Circuit judge assumed that the stipulations found therein were inserted by the agent of defendant without the knowledge and consent of the plaintiff. This we think was a question of fact, and should have been left to the jury.

The legal propositions mainly relied on and earnestly pressed by the respondent's counsel, need not be nor can they be successfully contested. They are sustained by abundant authority. "Where a carrier undertakes, without more, to transport beyond

its own line, the liability attaching at the commencement will ·continue throughout the transit to destination; all connecting lines of carriers employed in furthering and completing such transportation become the agents of the first carrier, and for their defaults he becomes responsible to the owner of the goods."

We need not go behind *Kyle* v. *Laurens Railroad Company,* 10 *Rich.* 382, ·for support to this proposition. There the Laurens Railroad undertook to deliver cotton in Charleston. The cotton was burnt on a connecting line. The Laurens road was held responsible, and why? Because its contract had been ·breached; it failed to deliver in Charleston. The court did not hold that the Laurens Railroad was a common carrier as to this ·cotton, and upon that ground liable for its loss, but that it had contracted to do what it had failed to do, and therefore was liable. And here, if it had appeared as a fact found by the jury, that the defendant had made a contract which, upon a legal construction, was without conditions and absolute, then the ·defendant would be responsible upon the same principle as in *Kyle* v. *Railroad Company, supra.*

The respondent further contends, that a common carrier cannot generally limit his liability by a special agreement. And in no event can he shield himself from the consequences of negligence or misconduct by an unconditional exemption from certain perils as fire, &c. This, too, he sustains by abundant authority. But it seems to be overlooked in the application which is sought to be made of these principles on behalf of the respondent, that they apply to common carriers and to common carriers alone; that they have no reference to others who may happen to transport goods at a certain time and place, when and where they are under no legal obligation to do this work, but have assumed it voluntarily, perhaps as much for the convenience as otherwise of the owner of the goods. It is conceded that they do have reference to common carriers; those who have undertaken the business of a common carrier either as a chartered company or otherwise, but we fail to see their application to the ·other class suggested.

The argument of respondent, it appears to us, has assumed the

Y

real point at issue, to wit: that defendant, as to the goods in question, was a common carrier. We do not think that the defendant was a common carrier beyond its *termini* under its charter. We hold that there was no legal duty on it to deliver goods beyond its line; that it might contract to do so, however, according to such terms as might be agreed upon between it and the shipper. This agreement might be either absolute or conditional. It might make the company substantially a common carrier, and therefore subject it to all the rules and principles contended for by the respondent, or it might contain limitation and restriction far short of this. But, whatever may be the contract in a given case, is a question of fact for the jury, which, when found and properly construed, must become the law of the case.

There is really no great difference between the English and American doctrine on this subject. The one holds that, to exempt a carrier from liability beyond its *terminus* there must be a special contract to that end. The other, that to make the first carrier responsible there must be a special contract to that end. Both admit that the carrier is not bound to go beyond the *terminus*, but that he may do so; and if he undertakes to do so he is bound by his undertaking. In the one case, if the contract contains no exemption it is absolute; in the other, if conditions are specified they must govern. This is nothing more than saying that the whole thing is per contract, and that whatever the contract is that must be enforced—the legal construction being, that in the one case, in the absence of exemptions, the carrier has contracted, unconditionally, to deliver; the other, with conditions inserted, they must control. But if there be a difference, that difference is immaterial here, because both parties claim a contract—the plaintiff an unconditional contract made with Mr. Hammet, and the defendant a conditional one made by Vaughn and accepted by the plaintiff in the receipt of the bill of lading. So at last, as we have said, the case hinges in the first instance upon a question of fact.

The principles announced in the leading case referred to by respondent's counsel (*Railroad Co.* v. *Lockwood,* 17 *Wall.* 357,) do not conflict with those above. The court in this case,

as is said in the argument, after a most careful examination of the principal authorities, both English and American, reached the conclusion, as announced in its opinion :  " First, that a common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law.   Secondly, that it is not just and reasonable, in the eye of the law, for a common carrier to stipulate for exemption from responsibility for negligence of himself and servants.   Thirdly, that these rules apply both to carriers of goods and carriers of passengers, and with special force to the latter."

These, no doubt, are all sound conclusions, and are not only well sustained by authority, but are founded on justice and wisdom, when applied, as this case evidently intended they should be, to the business of common carriers acting within their sphere —which business, in this day, has assumed such important and immense proportions.   There is not a word, however, in this case, or in the conclusions announced, which make these principles applicable to one who is not a common carrier, or denies to such one the privilege and right to contract for himself.   It must not be taken for granted that, because one is a common carrier between certain points, that he is also a common carrier beyond those points, and then apply the principles which have been established in reference to common carriers to him, both within and beyond his lines.

This distinction, it appears to us, has not been clearly observed in this case.   Hence we think that many of the authorities cited are not applicable.   In *Railroad Co.* v. *Lockwood, supra,* Mr. Justice Bradley, drawing the true distinction, said :  "A common carrier may undoubtedly become a private carrier or a bailee for hire, when, as a matter of accommodation or special engagement, he undertakes to convey something which it is not his business to convey.   *   *   *   In such case such agreement might be made in reference to his taking and conveying the same, as the parties chose to make, not involving any stipulation contrary to law or public policy.   But when a carrier has a regularly established business for carrying all or certain articles, and especially if that carrier is a corporation created for the purpose

of the carrying trade, and the carriage of the articles is embraced within the scope of its chartered powers, it is a common carrier, and a special contract about its responsibility does not divest it of the character."

Neither is there any conflict between the principles herein, and the well-considered case from New Hampshire, where the court held that where several common carriers are associated in a continuous line, one price for through freight being received by the initial company, the goods being marked and received to be delivered at a distant point beyond the *termini* of such initial company, that in such case the initial company is bound to carry them or see that they are carried to their final destination, and is liable for loss happening at any point along the line. *Nashua Lock Company* v. *The Worcester and Nashua Railroad Company*, 48 *N. H.* 339. That was upon the ground that from the facts mentioned, and nothing more, the court would conclude in accordance with the English doctrine, that the contract to deliver in that case was not an absolute contract to deliver at the point mentioned, and, of course, should be enforced as made by the parties. But there is nothing in that case which even intimates the idea that the initial company was bound to receive the goods, whether it wished to do so or not, or that the parties could not make a contract with stipulations if they saw proper to do so. That case is authority for the position that, where the initial company receives the goods, marked, and to be delivered to a distant point, with the freight paid to that point, and no stipulations are made to the contrary, the contract is absolute. It decides nothing more, and it is in accord with *Kyle* v. *Laurens Railroad Co.*, *supra*, but not at all in conflict with the positions taken hereinabove.

We think the charge of his Honor is subject to exception first and the specifications (*b*) and (*c*) thereunder, in that he declined so to charge. The other specifications under this exception assume a question of fact which the judge was not authorized to assume. These cannot be sustained.

Exceptions third, fourth and sixth are overruled. The third because the request is based on an assumption of fact, to wit: that the bill of lading was the contract. This, as we have seen,

was a question of fact for the jury and could not be assumed by the judge. The fourth claims that no previous agreement could alter the terms of the bill of lading. This would be true if the bill of lading constituted the contract, but that was the very question at issue. The sixth called upon the judge to charge that "whether the contract was the contract of the Columbia and Greenville Company or the contract of each successive line, yet that the exemption from the peril from fire attached to the goods all through." Each successive company was certainly a common carrier along its line, and while the goods were on each line, the common law liability of a common carrier, with all its absolute force, attached, and exemptions could not be made by which the company in possession could divest itself of the character of a common carrier; hence, the judge could not have charged this request.

Exceptions second, fifth, seventh and ninth are sustained.

Exception eighth we do not consider in the case. The exceptions have not been set out in full in this opinion, as this would have encumbered it too much. It is to be hoped that the reporter, in giving a statement of the case, will set them out.

Next and last, as to the admissibility of the letters of McCaughrin, the president of the defendant company. These letters were the written declaration of an agent, and their admissibility must depend upon the rules of evidence in such cases. These rules would allow such declarations when constituting a part of the *res gestae*, or when made within the scope of the agency, but declarations made some time after the act and beyond the scope of the agency should not be allowed. The letters contained an admission by the president of the liability of his company, or rather the expression of a legal opinion to that effect, and they were written some time after the controversy began. We do not think that this opinion was within the scope of the agency of the president, nor its expression a part of the *res gestae*. They were, therefore, inadmissible. Had they contained an admission of some fact connected with the contract, it would have been otherwise.

It is the judgment of this court that the judgment of the Circuit Court be reversed.

MR. JUSTICE McGOWAN *dissenting.*    In these cases I cannot concur in the judgment of my brethren for the reasons herein stated.    [Here follows his statement of the case.]    We will not follow the exceptions, but endeavor to dispose of the questions as they arise in order.    First, as to the contract between the parties.    The exceptions charge in various forms that it was error to leave it to the jury to decide what was the contract between the parties; that the only contract was the printed bill of lading; that all previous verbal negotiations upon the subject were absorbed into that, which became the only contract between the parties.

We believe it is the general rule in such cases where there have been no previous negotiations, to consider the bill of lading, although not signed by the shipper, given on one side and accepted by the other, as the contract of the parties.    But when there has been a previous general engagement on the subject, the question often arises whether the shipment was made on the terms of the bill of lading or upon the faith of the previous arrangement.    The rule of evidence is that "Parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument,    *    *    *    but the rule is not infringed by the admission of parol evidence showing that the instrument is altogether void, or that it never had any existence or binding force either by reason of fraud or for want of due execution, or for the illegality of the subject-matter.    1 *Greenl. Evid.*, § 248.

In this case the plaintiffs denied that they had ever accepted the terms proposed in the printed receipt, which was not signed by them, or made any such contract, but, on the contrary, insisted that the only agreement they had made was that made in Columbia by President Hammet with the general freight agent of the defendant corporation, in which nothing was said about limiting liabilities, but was as follows: "We shipped goods on November 22d, 1880, to Woodward, Baldwin & Norris; were delivered on that day at Piedmont to be carried to Baltimore. All our arrangements for shipment and through rates were made with the general freight agent of Columbia and Greenville Railroad Company.    We were to pay fifty-six cents for one hundred

pounds of freight to Baltimore. No contract as to limiting liability of defendant was made or ever alluded to." They insisted that upon the faith of this agreement alone they had shipped the domestics in question, and the defendant corporation could not at the last moment, after the property had been actually delivered, interpolate upon that contract new terms and conditions never submitted before nor agreed to by them.

The question as presented was not as to altering the terms of a written agreement, but whether the paper contained a contract at all. It certainly requires two to make a contract. It is elementary " that in order to constitute a binding contract there must be a definitive promise by the party charged, accepted by the person claiming the benefit of such promise. There must be a request on one side and an assent on the other. No contract is raised by a mere *ex parte* affirmation in discourse, a mere assertion, or offer to enter into an agreement not expressly and absolutely assented to by both parties." *Chit. Cont.* 9. Both parties must assent in the same sense. If the printed bill of lading had been before Hammet and the agent in Columbia when they made the general arrangement, and its terms had been agreed to, then it would have been the written contract of the parties beyond the reach of alteration by parol evidence, and to be construed by the judge alone. But whether the various stipulations in the receipt were ever agreed to and became the contract of the parties was a very different question.

It is true that the bill of lading seems to have been offered in evidence by the plaintiffs, probably because it contained the receipt of the defendant for the property ; but it does not follow that they are bound by the numerous conditions, exceptions and alleged agreements therein. Ordinarily a receipt is only evidence of a single fact, the closing fact of a transaction, and the act of but one of the parties. We would not expect to find in it original terms and conditions stated as agreed to by two contracting parties. "A receipt in itself does not express the terms of any contract or writing of the words of the parties between whom it has passed, but merely evidences, by way of admission, the fact stated in it, consequently it is not governed by the rules which prescribe the effect of instruments adopted by parties as the

special means of evidencing some compact or understanding had between them, but like evidence not enjoying any special privilege, is capable of being contradicted or modified by other classes of evidence." *Heath* v. *Steele,* 9 *S. C.* 92.

It could not be assumed conclusively that the Piedmont Company had agreed to the terms of the receipt, only because it was retained by the person, possibly a mere employe, who delivered the property at the depot. *Whiting* v. *Sullivan,* 7 *Mass.* 107; *Bostwick* v. *Railroad Co.,* 45 *N. Y.* 712; *Hutchinson on Common Carriers,* § 238, and *Lawson on Contracts of Carriers,* § 101. It seems to me that the point is fairly stated by Mr. Lawson at page 138, when he says : " When the shipper of goods, who has previously entered into an oral agreement with a common carrier, takes a receipt for the same, he has a right to assume, in the absence of notice to the contrary, that his agreement is embraced in the paper, or at least that his receipt contains nothing to the contrary, and that it is in the nature of a fraud on the part of a carrier, having entered into such oral agreement, to insert in the receipt a contract of an entirely different character and present it to the shipper without calling his attention to it or getting his assent." The question of what was the contract, whether the general agreement in Columbia, or the paper handed to the servant when the bales were delivered at the depot, was one of fact, and I cannot say that the judge erred in submitting it to the jury.

Assuming then, as we may do, that the jury found that the conditions expressed in the printed bill of lading were never agreed to by the Piedmont Company, but that the bales of domestics marked for Baltimore were sent to the depot under the general arrangement entered into by the president at Columbia, the verdict might be rested on that alone and go no further. In this view the defendant corporation undertook to transport the property to Baltimore; in the words of Mr. Hammet, that it was to be "carried to Baltimore" and there delivered to Woodward, Baldwin & Norris, to whom the bales were directed. This arrangement was made with the defendant corporation alone, without any reference to the means by which it was to be done or limitation as to responsibility. There was no privity of

contract with any other company whatever. So far as appears, the defendant corporation or its agent had no authority to make a contract binding upon intermediate companies for their respective shares of the service to be rendered; but they, without any reference to any such agencies, undertook themselves to give through transportation, to do or have done the whole work and to deliver in Baltimore, thereby, as I think, making for that purpose and to that extent, all connecting lines their agents, or, as it were, extending their own road to Baltimore. If their own track did not actually extend to Baltimore, they, nevertheless, undertook the business through to that point and received pay for it, and they cannot now be permitted to disclaim their own contract or escape the liabilities incident to it.

If time permitted I might review the numerous authorities upon the subject, but we can only deal with conclusions. After much discussion and some difference of opinion, we regard the law as properly held, both on principles of justice and the preponderance of authority, in the well-considered case of " *The Nashua Lock Company* v. *The Worcester* and *Nashua Railroad Company,* 48 *N. H.* 339, where, after a full review of the authorities, it was held that, " When several common carriers are associated in a continuous line of transportation, and in the course of the business goods are carried through the connected lines for one price, under an agreement by which the freight money is divided among the associated carriers in proportion fixed by the agreement; if the carrier at one end of the line receives goods to be transported through, marked for a consignee at the other end of the line, and on delivery of the goods takes pay for transportation through, the carrier who so receives the goods is bound to carry them or see that they are carried to their final destination, and is liable for an accidental loss happening at any part of the connected line."

I refer to this case for the authorities cited, and the reasons upon which the doctrine is based. This New Hampshire case was much stronger than the one in hand. There the initial company was held liable for doing nothing more than receiving and transporting the goods marked to be delivered at a point beyond their own road. Here this was done, but there was also

an agreement that the goods should ".be carried to Baltimore;" that is, delivered in Baltimore. Upon this very point as to what shall be regarded as sufficient evidence of an undertaking to transport through, there has been much diversity of opinion in the American courts, which (Mr. Hutchinson informs us at section 148 of his book on Carriers) are about equally divided on the point "whether a carrier receiving goods marked for delivery beyond the end of his line is, in the absence of special agreement, only responsible for safe carriage. over his own line and safe delivery to the next carrier." See late Tennessee case of the *Louisville & Nashville Railroad Company* v. *Weaver*, 9 *Lea* 39, and 42 *Am. Rep.* 655, and *notes.* I believe that when the company receiving the goods is known to be one of a continuous line of associated companies, and there was, as here, a special agreement of the initial company to transport through, there has never been a doubt expressed in any court.

It is, however, earnestly urged on the other side that the defendant corporation was a common carrier by law only as to their own road, and that their duties should be correlative to their rights and not beyond; that as to so much of the Columbia agreement as was to be performed beyond Columbia, the company must be considered as an individual undertaking to transport certain bales of goods for hire, which single transaction would not make him a common carrier or subject to the rigorous liability imposed upon carriers. The obvious answer to this is that the defendant corporation, when they agreed to transport these goods, was already a common carrier all the way to Baltimore, by virtue of their being engaged with the associated lines in the regular business of through transportation to that point.

The transportation of the few bales of domestics in this case was not a single, isolated act for accommodation or compensation, but one of the acts done in the course of through business, in which they were regularly engaged. It appeared that they canvassed for through business, had arranged the price for which they could do it, and prepared a most elaborate through-receipt. As Mr. Hammet proved, they were at that time engaged in extensive through business "shipping over these routes." As I

understand it, common carriers are not limited to those created by charter, but may become such by virtue of their occupation. *Railroad Company* v. *Lockwood*, 17 *Wall*. 357. Mr. Tomlinson, in his Law Dictionary, says : "All persons carrying goods for hire, as masters and owners of ships, lightermen, stage coachmen and the like, come under the denomination of common carriers." In the case of *Clarke* v. *Swearingen*, 6 *S. C.* 292, Mr. Swearingen was treated as a common carrier, for the reason that during the winter months he was engaged in the business of boating cotton for hire down the Savannah river to Augusta.

The Greenville Company were common carriers to the extent of their road by charter, and beyond that by virtue of being engaged in the business of through transportation. Their liability as common carriers should not be measured by the length of their road, but by the extent of their undertakings in their business of through transportation either by themselves or in connection with other associated lines. We think there was competent evidence before the jury that the company undertook to carry this property to Baltimore, and the jury having found such to be the fact, the other companies are to be deemed the agents of the defendant, for whose fault they are responsible." *Railroad Company* v. *Pratt*, 22 *Wall*. 133. A man who owns a private ferry may make himself a common carrier if he undertake to carry for hire all persons indifferently. *Littlejohn* v. *Jones*, 2 *McMull*. 368. And this is a question of fact to be determined by the jury. *Ibid.*

The law is so well stated in the case from Tennessee (as late as 1882) above cited, that I will venture to make a somewhat long quotation : " It is well settled that a railroad company, as a common carrier, may contract to carry to a point beyond the *terminus* of its own line so as to become liable for its delivery at that point, and that the liability thus attaching at the commencement, will continue throughout the whole transit, all connecting lines of carriers employed in furthering and completing such transportation, becoming its agents, for whose defaults it is responsible. *Railroad* v. *Stockard*, 11 *Heisk*. 568 ; *Hutch. Carr.*, § 145. But the courts are not in accord as to what will, *prima facie*, constitute such a contract.

"In England the courts from the first adopted the rule, to which they have formerly adhered, that when a railroad company, as a common carrier, receives goods directed to a place beyond the *terminus* of its own line, without limiting its responsibility by express agreement, such receipt of the goods so directed is *prima facie* evidence of an undertaking to carry the goods to the place to which they are directed, and all connecting railroad companies, or other carriers along the route, are merely the agents of the first company. The latter is alone subject to suit for any loss or damage to the goods, the other companies not being responsible to the owner for want of privity of contract. *Muschamp* v. *Railway Co.*, 8 *Mees. & W.* 421. The rule, founded as it is in common law principles, has much to recommend it by reason of its uniformity and simplicity, and has been found to work well for the comparatively short distances of carriage on the British island. It has been followed by the courts of a number of States in this country, but modified, generally, so as to give an action against the carrying company actually guilty of the wrong out of which the cause of action arises, although not the original contracting company. All of the American courts, perhaps, except it may be those of Georgia, concur in adopting the English rule, with the modification suggested, wherever the contract is clearly a through contract, or the circumstances show that the contracting company has an interest, or partner, or otherwise, in the entire route. *Hutch. Carr.*, § 160. The courts of the State of Georgia seem to have adopted the English rule without qualification. Many of the States have been led to modify the rule, not only in allowing the actually defaulting carrier, other than the first, to be sued, but in the matter of the *prima facie* evidence of a through contract and the burden of proof," &c.

In the case at bar there was no need of resorting to the rule as to *prima facie* proof of the contract; the proof was positive, and besides the circumstances showed most conclusively that the contracting company had an interest in the through transportation "as partner or otherwise." This was properly a question for the jury, and they have so found.

But, suppose we assume that the person who carried the

domestics to the depot at Piedmont had the authority to act for the company in receiving the printed receipt with the numerous stipulations embodied therein, and the jury found that to be the only contract between the parties: I incline to think that, even in that case, the verdict should stand. At the time these goods were shipped the act of 1864 was of force in this State. It has since been superseded, but we must consider it in determining the rights of these parties. Section second declared: "That no public notice, or declaration, or special contract shall limit or in any wise affect the liability, at common law, of any railroad company within this State, for or in respect of any goods to be carried and conveyed by them, but such railroad company shall be liable, as at common law, to answer for the loss of or injury to any articles or goods to be carried or conveyed by them, any public notice, declaration or special contract by them made and given contrary thereto, or in any wise limiting such liability, notwithstanding." *Rev. Stat.* 366.

The defendant corporation was a "railroad company within this State," and, of course, subject to the law, and there can be no doubt that, according to its terms, the exemptions from liability inserted in the bill of lading, were void and of no effect so far as they concerned transportation on the track of the Greenville and Columbia Railroad Company proper. But it is insisted that the liabilities of the company must be limited to their own road; that not being carriers beyond, they were not compelled to take the business, and if they did so they had the right to attach their own conditions, and the provisions of the act did not apply to any agreement to transport beyond Columbia.

This might be so if this had been a single act of transportation, undertaken by contract for the accommodation of the Piedmont Company, but we have already endeavored to show that, by engaging in the business, they had previously acquired the character of a common carrier as to the through transportation, and must be held to an accountability as such. If so, was not a contract as to that business as much under the inhibitions of the act as business upon their own rails? It has been decided in this State that the agreement of a railroad company to deliver articles at a point beyond the *terminus* of their own road, made

them liable as carriers until the point was reached and the articles delivered.    *Kyle* v. *Laurens Railroad Company,* 10 *Rich.* 382; *Hutch. Carr.*

In the case of Kyle, the plaintiff shipped cotton on the Laurens Railroad, to be delivered in Charleston; two other roads had to be used in reaching Charleston; part of the cotton was lost after it left the lower *terminus* of the Laurens road, and yet it was held that the Laurens Company was liable for the loss, "their undertaking being special to deliver in Charleston." That is to say, their contract as carriers extended beyond their own road to the point of delivery.

But it is said while that may be so as to roads within the State, the principle does not apply and our State law did not reach transportation on railroads beyond the limits of the State. I do not understand why not. I do not see why the South Carolina law which applies to railroads in the State, should not apply to them as well while running the road of another company beyond this State. In either case one carrier is using the road of another carrier in doing carrier business. Both are carriers and it would seem that the one which undertakes to transport the property should be subject to the law applicable to common carriers in the State where it is located, and the contract is made. The contract was an entirety for the whole distance, made in the State, to be paid in the State, and to a corporation of the State, and I suppose the fact that the property was to be carried beyond the State through other associated lines, could not change the rule which requires that a contract shall be construed according to the *lex loci contractus.* *McDaniel* v. *Railroad,* 24 *Iowa* 412; *Cantu* v. *Bennett,* 39 *Texas* 303.

It is not, however, necessary to affirm anything upon this point. If we assume that the special law of this State, declaring null efforts to restrict liability in certain cases, did not apply to so much of the printed receipt as stipulated to transport beyond her borders, still, as I suppose, the defendant corporation being a common carrier *quoad* the through transportation was amenable to the general law upon the subject of the liability of carriers; which, while it allows parties to limit their liability by special

contract, does not allow such limitations as will destroy the character of the parties as common carriers.

For many good reasons the law is very watchful of the rights of shippers. The general doctrine, as I understand it, is laid down in 2 *Greenl. Evid.* 260 : " If the acceptance of the goods was special, the burden of proof is still on the carrier to show not only that the cause of the loss was within the terms of the exceptions, but also that there was on his part no negligence or want of due care." See *Singleton* v. *Hilliard,* 1 *Strobh.* 203 ;. *Swindler* v. *Hilliard & Brooks,* 2 *Rich.* 302 ; *Baker* v. *Brinson,* 9 *Rich.* 201 ; *Railroad Company* v. *Lockwood, supra ; Hutchinson on Carriers,* § 260. The last named authority, at the section given, says : " That the weight of authority in this country is in favor of excluding negligence altogether as an element of contract between the carrier and his employer and of holding the former to a rigid accountability for every degree of negligence, without the power by contract or in any other mode to divest himself of it."

In the case of *Swindler* v. *Hilliard, supra,* the defendants· had a steamboat running between Charleston and Columbia.. They received cotton in Columbia and gave a bill of lading with these words incorporated into it, " Damages of fire and navigation only excepted." The cotton was burnt on the boat, and it was held, " That carriers can not by any special contract exempt themselves from liability for losses arising from negligence, and when there is a special acceptance the *onus* of showing not only that the cause of the loss was within the terms of the exception, but also that there was no negligence, lies on the carrier."

In the case from the Supreme Court of the United States, *supra,* after exhaustive consideration of the whole subject and a careful examination of the authorities, it was held, " First, that a common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law ; and second, that it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for negligence of himself or his· servants."

I conclude, even if the printed receipt constituted the only

contract between the parties, that the defendant corporation having assumed the business of a common carrier as to the through transportation, and received the property addressed to Baltimore, was bound, notwithstanding the stipulations of exemption, to carry out the main undertaking therein, "to transport to Columbia, and thence by connecting lines to Baltimore." The law will not allow parties to do the business of common carriers and to receive pay as common carriers and at the same time to renounce all responsibility as common carriers. The *onus* was upon the defendant corporation to show that the property was not destroyed through negligence, which they did not do.

In the language of Judge Withers, in the case of *Baker* v. *Brinson, supra:* "Whilst in this State we recognize the doctrine that a carrier may limit by special contract his common law liabilities, there is not the slightest disposition further to modify the rules justly applicable to such transactions. Learned judges in England and America have regretted the recognition of such exceptions. Notwithstanding their apparent rigor, there is a salutary policy in these common law doctrines, and those who are called to administer the law must see to it that they are not wholly evaded."

I think the judgment below should be affirmed.

Judgment reversed.